**Opinion issued January 22, 2026**



In The

# Court of Appeals

For The

# First District of Texas

———————————————

**NO. 01-25-00622-CV**

———————————————

## IN THE MATTER OF L.G.

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-02077J**

---

## MEMORANDUM OPINION

The juvenile court waived its jurisdiction over L.G., a minor, and transferred him to the criminal district court to be tried as an adult for capital murder. L.G. argues that the juvenile court erred in doing so. We affirm.

## Background

This case arises from the murder of a homeowner in her backyard. The decedent was stabbed over 25 times, and her son found her body in a backyard

shed. L.G.'s house was adjacent to the decedent's home. The decedent's and L.G.'s DNA were found on his shoes, gloves, and knife. L.G. was 15 years old at the time of the murder.

After an investigation, L.G. was arrested and charged with capital murder. The State moved that the juvenile court waive its jurisdiction and transfer L.G. to the criminal district court to stand trial as an adult. L.G. was 16 years old at the time of the transfer hearing. At the hearing, the juvenile court received documentary evidence and heard testimony from a law enforcement officer who investigated the murder and a psychologist who examined L.G.

## A. Law Enforcement Testimony

The law enforcement officer testified that on the day of the murder, authorities responded to a 911 call from a neighbor. The neighbor reported finding a bloody knife and gloves in his backyard. Shortly after he got off the phone with 911 but before officers had responded, the neighbor witnessed L.G. running across his lawn. The neighbor went upstairs for a better view, and he saw L.G. run back into his own yard. When the neighbor went back outside, the knife and gloves were gone. The neighbor told law enforcement what had happened when they arrived about an hour later.

The law enforcement officer went to L.G.'s residence to speak with L.G. L.G. told the officer that he had been outside doing chores, flipping a knife, and the

knife fell over into the neighbor's yard. He said that he jumped the fence to retrieve it. Law enforcement collected the knife as well as L.G.'s sandals, clothing, gloves, and cell phone. DNA analysis revealed that the items had both L.G.'s and the decedent's DNA on them.

L.G. was arrested and later confessed to the murder. L.G. told law enforcement that he was in his backyard cutting weeds when he looked over the fence line and saw the decedent in her hot tub with her back facing outwards. He said she looked vulnerable and helpless. He jumped a fence, ran across another neighbor's yard, exited a side gate, and entered the decedent's backyard through a side gate. He took off his shoes to avoid getting blood on them. He ran up to the decedent and began to stab her. At some point in the altercation, she got out of the hot tub. L.G. told investigators he continued to stab her about six or seven times in the chest. She tried to run away, and he pursued her around the patio and into her house. He was able to pull her back out of her house onto the patio.

When she succumbed to her injuries, L.G. attempted to conceal her body. He dragged her off the patio, through the grass, and into a shed. He removed rocks keeping the shed doors closed, opened the shed, and pulled her inside. He then closed the shed and replaced the rocks where he had found them. He covered blood in the house with rugs and attempted to prevent the decedent's cell phone from working by covering it in tinfoil. L.G. tried to remove blood from the knife by

stabbing it into the ground several times. He then threw away the gloves he was wearing in his trash can. Law enforcement recovered them when speaking to L.G.

The law enforcement officer also testified that he had spoken with the decedent's son at the request of the prosecutor. The son relayed that in a prior hearing, when L.G. was allowed to hug his mother, he did so while looking directly at the decedent's son and smirking. The law enforcement officer testified that the decedent's son said that it really upset him because the probable cause statement, describing what had happened to his mother, had just been read in court.

## B.    Psychiatric Evaluation

A psychologist from the Harris Center for Mental Health and the Harris County Juvenile Forensic Unit testified regarding her evaluation of L.G. She testified that she supervised the evaluation which was conducted by a doctoral intern. Throughout the evaluation, L.G. showed the ability to concentrate and focus and his thought process was logical and coherent. She testified that on the advice of his counsel, L.G. did not answer questions related to homicidal thoughts or ideations, which are used to assess risk of dangerousness or the presence of mental health disorders, but he had given indications to detectives that he had experienced homicidal thoughts for months prior to the murder. He also stated that when he was about 10, he was obsessed with burning paper.

Prior to the incident, L.G. reported having a small group of friends. He was in the gifted and talented program at his high school. He had no history of physical or mental health issues. He had no previous encounters with the juvenile justice system. The psychologist described L.G.'s behavior since entering the juvenile detention center. He had received various minor infractions, such as horseplaying, not following staff instructions, and possessing a contraband pen in his room.

The psychologist conducted an IQ test. L.G. scored 117, which falls in the high-average range. His "personality assessment inventory" indicated that he had low interest in treatment and low motivation. As far as his results of "Risk-Sophistication-Treatment Inventory," when including the murder, he scored in the middle offender range for risk of dangerousness. He was in the high range for sophistication and maturity. He knew the difference between right and wrong and had a basic understanding of the law. The psychologist opined that L.G. had difficulty understanding how his actions affected others.

The psychologist testified that normally as time goes on, a youth acknowledges the impact of his choices more and shows more empathy toward the victim. The psychologist questioned L.G.'s level of empathy, as evidenced by the fact that after the murder he went home and resumed his normal routine, attending a family party that night. She said empathy is crucial for avoiding repeated harmful behavior because it helps youth understand the impact of their actions. She testified

5

that normally she would expect more empathy or acknowledgement of impact than the levels L.G. displayed. The psychologist testified that L.G.'s ability to mask how he was feeling and keep his anger concealed gave her concern for risk of future dangerousness.

The court entered an order finding that the seriousness of the alleged crime and L.G.'s conduct during it and L.G.'s background required that he be transferred to the criminal district court for prosecution as an adult. L.G. appeals the juvenile court's order waiving its jurisdiction and transferring him. *See* TEX. FAM. CODE § 56.01.

## Juvenile Court's Waiver of Jurisdiction

L.G. contends that the juvenile court's decision to waive its jurisdiction and transfer him to the criminal district court to be tried as an adult must be reversed because the evidence is factually insufficient to sustain the juvenile court's stated findings supporting its order to transfer him to the criminal district court.

## A.    Criteria for waiver of juvenile jurisdiction

Children ordinarily are not subject to criminal proceedings like adults. Instead, juvenile courts have exclusive original jurisdiction over cases involving what otherwise would be criminal conduct by children 10 years of age or older and under 17 years of age. TEX. FAM. CODE §§ 51.02(2)(a), 51.03(a)(1), 51.04(a). If a juvenile court determines that certain conditions are met after an evidentiary

6

hearing, it may waive its jurisdiction and transfer a child to the district court for criminal proceedings. *Id.* § 54.02(a), (c). The State initiates this process by requesting a hearing and providing notice.

To transfer a child who is alleged to have committed a felony of the first degree, like capital murder, to the criminal district court, a juvenile court must find that (1) the child was 14 or older at the time of the alleged offense; (2) there is probable cause to believe the child committed the offense; and (3) the seriousness of the alleged offense or the background of the child requires criminal rather than juvenile proceedings. *Id.* § 54.02(a).

The State has the burden to persuade the juvenile court by a preponderance of the evidence that the welfare of the community requires transfer of jurisdiction for criminal proceedings, either because of the seriousness of the offense alleged or the background of the child or both. *Bell v. State*, 649 S.W.3d 867, 886 (Tex. App.—Houston [1st Dist.] pet. ref'd). In deciding whether the preponderance of the evidence satisfies this last requirement, the juvenile court must consider four non-exclusive factors:

> (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
>
> (2) the sophistication and maturity of the child;
>
> (3) the record and previous history of the child; and

(4) the prospect of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

*Id.* § 54.02(f).

All four of the 54.02(f) criteria need not weigh in favor of transfer for a juvenile court to waive its jurisdiction. *In re S.G.R.*, 496 S.W.3d 235, 239 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Any combination of these criteria may suffice. *Id.* Not every factor need weigh in favor of transfer to the criminal district court. *Bell*, 649 S.W.3d at 886. If it decides to waive its jurisdiction based on its consideration of these factors, the juvenile court must enter a written order in which it states specifically its reasons for waiver and its findings. TEX. FAM. CODE § 54.02(h).

## B. Standard of Review

We review a juvenile court decision to waive its exclusive original jurisdiction and transfer a case to the criminal district court using two steps. First, we review the legal and factual sufficiency of the evidence relating to the juvenile court's specific findings of fact regarding the four factors stated in section 54.02(f). *S.G.R.*, 496 S.W.3d at 239. When reviewing the legal sufficiency of the evidence, we credit the proof favorable to the findings and disregard contrary proof unless a reasonable factfinder could not reject it. *Id.* If there is more than a scintilla of evidence supporting a finding, then the proof is legally sufficient. *Id.* When

reviewing the factual sufficiency of the evidence, we consider all the proof presented to determine if the juvenile court's findings are so against the great weight and preponderance of the proof as to be clearly wrong and unjust. *Id.* Our review of the sufficiency of the evidence supporting waiver is limited to the facts the juvenile court expressly relied on in its transfer order. *Id.*

If the findings of the juvenile court are supported by legally and factually sufficient proof, then we review the ultimate waiver decision under an abuse of discretion standard. *S.G.R.*, 496 S.W.3d at 239. As with any decision that lies within the discretion of the trial court, the salient question is not whether we might have decided the issue differently. *Id.* Instead, we consider in light of our review of the sufficiency of the evidence whether the juvenile court's decision represents a principled application of the section 54.02(f) factors or was arbitrary or made without reference to the statutory criteria for waiver. *Id.* So long as the juvenile court correctly applies these criteria and complies with the requirement to specifically state its supporting findings, its waiver decision will pass muster under our standard of review. *Id.*

## C. Analysis

The juvenile court did not abuse its discretion by waiving its jurisdiction.

L.G. stipulated to his date of birth and confessed to his participation in the murder. TEX. FAM. CODE § 54.02(a)(1)–(2). He was fifteen years old at the time.

Thus, the dispositive issue before the juvenile court was whether the seriousness of the offense or L.G.'s background required criminal proceedings instead of juvenile proceedings. *See id.* § 54.02(a)(3). L.G. does not contest that the evidence was legally sufficient to support the juvenile court's findings. He argues instead that the evidence was factually insufficient to find that the section 54.02(f) factors weighed in favor of transfer.

The juvenile court's order states that the court based its findings on its "observations at the hearing, the clerk's record, the diagnostic studies, the social evaluations, the circumstances of the child and the offense, and all the evidence presented at the hearing." After noting that it had considered the section 54.02(f) factors, the court found there was probable cause to believe that L.G. committed capital murder. The court further found that the welfare of the community requires criminal proceedings due to "the seriousness of the alleged" capital murder and "this juvenile respondent's conduct during it." Finally, the court noted "the background of the juvenile respondent necessitates transfer to criminal district court for the welfare of the community."

The juvenile court found that, as an offense against the person, capital murder favored waiver of its jurisdiction, and L.G. does not contest this finding. *See* TEX. FAM. CODE § 54.02(f)(1). He instead argues that waiver is not appropriate merely because the offense was a serious one committed against a person, and that

10

the trial court did not properly consider that L.G. had no prior history of violence or substance abuse disorders.

It is not "merely the category of crime" or its consequence that are serious; the circumstances of the crime are significant as well. *See In re. J.B.*, No. 01-24-00644-CV, 2025 WL 409407, at *1 (Tex. App.—Houston [1st Dist.] Feb. 6, 2025, no pet.) (mem. op.) (holding capital murder involving pistol whipped victim who was shot in the back while he lay prone and helpless was gratuitous crime exhibiting malice and callous disregard for human life); *S.G.R.*, 496 S.W.3d at 243 (indicating that when the crime is sufficiently brutal and malevolent, nature of the crime alone may support waiver of juvenile jurisdiction).

At the hearing, the law enforcement officer described a gruesome murder scene. *See In re Z.M.*, No. 02-21-00213-CV, 2021 WL 4898851, at *5 (Tex. App.—Fort Worth Oct. 21, 2021, no pet.) (mem. op.) (nature and seriousness of alleged offense, alone, may justify juvenile court's waiver of jurisdiction "notwithstanding other section 54.02(f) factors, so long as the offense: (1) is substantiated by evidence at the transfer hearing, and (2) is of sufficiently egregious character"). He testified that the decedent suffered 7 or 8 stab wounds to her chest and was stabbed by L.G. at least 25 times. He found blood around the hot tub, on the patio, and inside the house. The decedent had defensive wounds to her hands indicating a struggle. L.G. told the officer that he saw the decedent in her hot

11

tub, and she looked "vulnerable" and "helpless." L.G. jumped the fence, approached her from behind, and began to stab her. L.G. told law enforcement that the decedent fought back and went into her house, but he followed her and was able to bring her back on the patio. The law enforcement officer testified that L.G. told him that once the decedent died, he dragged her to the shed.

As to L.G.'s sophistication and maturity, the psychiatric evaluation, admitted into evidence at the transfer hearing, and testimony from the psychiatrist indicated that L.G. demonstrated understanding of the court proceedings and had a high average range IQ. L.G. had been enrolled in his high school's gifted and talented program before the incident. The record reflects that L.G. understood the legal process. *See In re K.J.*, 493 S.W.3d 140, 151 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (stating whether juvenile can assist attorney in his defense is a relevant consideration when assessing juvenile's maturity and sophistication).

Moreover, L.G.'s efforts to conceal the crime showed his sophistication and maturity. *See In re K.M.*, No. 01-20-00121-CV, 2020 WL 4210493, at *11 (Tex. App.—Houston [1st Dist.] July 23, 2020, no pet.) (mem. op.) (evidence that juvenile attempted to conceal participation in crime was fact supporting sophistication and maturity). L.G. removed his shoes before the attack so they would not get blood on them. He moved the rocks keeping the shed door closed, dragged the decedent's body inside, closed the shed, and replaced the rocks. He

covered the blood inside the residence, and he stabbed the knife used in the murder into the ground several times to try to conceal the blood. He also wore gloves during the commission of the crime and attempted to prevent the decedent's phone from working properly by covering it in tinfoil. L.G. returned home after the murder and attended a family party that evening.

As to the third factor, it is undisputed that L.G. has not been involved in the juvenile justice system and had only minor infractions while detained, but that does not prevent the juvenile court from deciding that the evidence still weighs in favor of transfer. The juvenile court is "free to decide to transfer [a] case due to the seriousness of the crime, even if the background of the child suggests the opposite." *Bell*, 649 S.W.3d at 899 (quoting *C.M. v. State*, 884 S.W.2d 562, 564 (Tex. App.—San Antonio 1994, no pet.)).

As to prospects of adequate protection of the public and the likelihood of rehabilitation in the juvenile system, the psychologist testified that L.G. had little appreciation of the impact of the crime on others. She testified that she had concerns for L.G.'s future dangerousness, given his lack of empathy and ability to mask his feelings. She pointed to the fact that he committed the murder and then returned to his family home to attend a party that evening and the fact that as time passed, she would have expected him to have more understanding of the impact of his actions and to develop more empathy. While L.G. argues that the juvenile court

13

should have given greater weight to the programs for rehabilitation that exist in the juvenile justice system, the court could have reasonably concluded that L.G.'s attitude about crime made him a less likely candidate for rehabilitation.

We hold that the juvenile court's findings are supported by factually sufficient evidence. The juvenile court's findings are not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. Because the court's ultimate waiver decision was made with reference to guiding rules and principles, we conclude that the juvenile court did not abuse its discretion when it waived its jurisdiction and transferred L.G.'s case to the criminal district court.

We overrule L.G.'s issue on appeal.

## Conclusion

We affirm the juvenile court's transfer order.


Susanna Dokupil
Justice

Panel consists of Justices Guerra, Caughey, and Dokupil.

14